**AMERICAN FEDERATION OF GRAIN MILLERS, A. F. OF L. et al.**
v.
**GENERAL MILLS, Inc.**
Civ. No. 4526.

United States District Court
D. Minnesota, Fourth Division.
Dec. 4, 1953.

William D. Gunn (of Gunn & Savel-koul), Minneapolis, Minn. (Jacobs, Ka-min & Ratner, Chicago, Ill., of counsel), for plaintiffs.

John J. Finn, Jr., A. Lyman Beards-ley and Morley, Cant, Taylor, Haver-stock & Beardsley, Minneapolis, Minn., for defendant.

NORDBYE, Chief Judge.

In that the plaintiffs and the defendant each move for a summary judgment, it necessarily follows that the parties recognize that there is no genuine issue as to any material fact and that the matter should be disposed of on the plead-ings, exhibits, and the affidavits on file. Briefly, the controlling facts may be stated as follows:

Plaintiffs are an international union and one of its affiliate unions. Apparently the international union has for some years negotiated with the defendant a master or system-wide labor agreement embracing the production and maintenance employees of General Mills at some 29 plants throughout the country. During 1952, negotiations were had between plaintiffs and defendant for a new labor agreement, and among other changes the parties agreed that, to each employee who had worked continuously for ten years for the defendant, a three weeks' vacation period should be allowed during each calendar year. Under the terms of the prior agreement, in order to obtain a three weeks' vacation, an employee must have rendered at least fifteen years continuous service for the defendant, and employees under the previous contract who had served more than two years and less than fifteen years in continuous service were allowed a two weeks' vacation during each calendar year. However, the contract provisions granting the three weeks' vacation benefit to employees who had rendered ten years continuous service, as well as other contract provisions, had to be approved by the Wage Stabilization Board. On September 13, 1952, a joint application was made to the Board by the parties hereto requesting leave to put into effect, among other things, the vacation adjustments contained in the agreement. The petition stated that the parties intended that the increased vacation benefits should take effect January 1, 1952. This statement was incorporated in the following language:

"It is the intention of the parties that the various contract changes shall take effect as follows:

*      *      *      *

"Vacation Benefits: January 1, 1952  *  *  *."

No action was taken by the Board, and on February 6, 1953, the President of the

United States issued an executive order abolishing wage controls. Therefore, after that date, there were no restrictions with reference to the contract provisions which pertained to increased vacation benefits. After wage controls were abolished, plaintiffs requested the defendant to put into effect the changes in the 1952 agreement which had required Wage Stabilization Board approval. Defendant did make certain changes retroactive, such as increased compensation for holiday work during 1952 and making an employee whole for wages lost as a result of jury service in 1952. These matters were also incorporated in the new wage contract, but were held in abeyance awaiting approval of the Wage Stabilization Board. However, the defendant refused to grant the increased vacation benefit claimed by the plaintiffs. Thereafter, plaintiffs instituted this suit to recover one week's compensation for a number of employees of defendant's flour and feed mills in Minneapolis. These employees were entitled, under the terms of the 1952 agreement, to three weeks' vacation. However, they were allowed only two weeks' vacation by reason of the pendency of the joint petition before the Board, and now seek a week's compensation in lieu of the third week's vacation which they did not receive.

It is apparent that the reason why the approval of the Wage Stabilization Board had to be obtained by the parties was due to the definition of wages, salaries, etc., as found in the Defense Production Act of 1950, as amended in Section 702(e), 50 U.S.C.A.Appendix, § 2152(e), which provides:

> "The words 'wages, salaries, and other compensation' shall include all forms of remuneration to employees by their employers for personal services, including, but not limited to, vacation and holiday payments, night shift and other bonuses, incentive payments, year-end bonuses, employer contributions to or payments of insurance or welfare benefits, employer contributions to a pension fund or annuity, payments

in kind, and premium overtime payments."

To all practical purposes, therefore, we are dealing with an increase in wages which was granted to certain employees by way of increased vacation benefits to take effect on January 1, 1952, but which had to be held in abeyance until the approval of the Wage Stabilization Board was obtained. At the outset, it must be made clear that this particular contract provision was not illegal when agreed upon between the parties. The only way that such provisions could be made effective was to incorporate them in an agreement and then petition the Wage Stabilization Board for approval. This is the method or procedure which the law contemplated. The impossibility of performance in 1952 was not necessarily permanent, but merely a temporary impossibility of performance, and when the impossibility ended, the performance by the promisor would not impose upon it a burden substantially greater than that which would have resulted had there been no restrictions upon an increase in vacation benefits. True, if the impossibility of performance did not end until 1953, the increased 1952 vacation benefits could not be granted literally. But the essential contract benefits contemplated by the parties could nevertheless be granted by wages in lieu of vacation benefits. That the parties to the contract had such a conception of the liberalized vacation benefits seems reasonably clear because when the contract was entered into and the petition was made to the Wage Stabilization Board for approval, the representatives of the parties discussed the necessity of granting additional wages to employees in lieu of the vacation period if by reason of delay in the Wage Stabilization Board action, the approval of the contract provisions was not forthcoming until the latter part of 1952; that is, it was recognized that, if it would be impractical to bestow the increased vacation benefits on any employee by reason of the Board's approval being delayed until late in the year of 1952, then a week's pay should be al-

lowed such employee in lieu of the week's vacation which was denied to him. Defendant contends, however, that such discussion did not consider the situation which might arise if the approval of the Wage Stabilization Board was not obtained until 1953. However, it would seem that the problem presented under the present situation seems reasonably comparable; that is, the problem of performance is not essentially different. If the parties recognized the obligation of performance by defendant of making a cash payment in lieu of a vacation period which could not be bestowed by reason of a deferred Wage Stabilization Board approval during 1952, the performance by the promisor is not vitally different if the deferment of the approval delayed the performance until 1953. Moreover, there was ample precedent for an employee of General Mills, with the agreement of the parties, to work during his vacation period and to receive double time for such period when his continued uninterrupted services for the company seemed vital.

Defendant, however, relies heavily on Clauses 55 and 56 of the contract and urges that these provisions deny plaintiffs any right in 1953 for vacations not taken in 1952. It is to be gathered from the showing herein that defendant has proceeded under the assumption that Clauses 55 and 56 are the covenants which prevent it from recognizing plaintiffs' claim herein. This seems evident because the defendant has paid in 1953 to the employees who were on jury service in 1952 the difference between the jury fees received and their wages. Also, the defendant has paid to the employees in 1953 the increased time for holiday work in 1952 which the 1952 contract provided and which was likewise held in abeyance pending Wage Stabilization Board approval.

Clauses 55 and 56 provide as follows:

"55. Vacations cannot be postponed and allowed to accumulate from year to year.

"56. Employees cannot waive their vacations and draw double pay by working during the time allowed."

A consideration of these clauses and their evident intent and purpose suggests no barrier to the present claim of the plaintiffs. The extra week vacation period involved herein was not postponed or waived by the employees. In other words, the employer was willing to grant the extra week and the employees were willing to accept it, but due to inhibitons imposed by a federal agency, the parties had to defer fulfillment of their contract. No doubt Clauses 55 and 56 were incorporated in the contract for the benefit of both parties, and when they were waived it was to be done by consent of both parties when the circumstances seemed to justify such action. But the clear purpose of Clause 55 was to require an employee to take his allotted vacation period during any calendar year so as to avoid an accumulation of vacation periods in a subsequent year or years, which might on one hand disrupt the service of the employer and on the other hand be harmful to the employee because of his failure to take a vacation during each calendar year in order to obtain a needed rest and change and thus equip him mentally and physically for a continuation of his assigned duties. Clause 56 is unambiguous and likewise was intended to require an employee to take his vacation for the same obvious purposes. However, Clause 56 was waived by the parties when circumstances seemed to justify such waiver. It may be noted that these clauses were carried over from previous contracts and were not inserted in this present contract in order to effect the rights of the parties for increased vacation benefits. Moreover, here we are confronted with an abnormal and unusual situation which is not within the purview of these two clauses, and it seems apparent that the parties did not contemplate that these clauses should govern the present situation. This seems evident when the defendant recognized its obligation to pay double time to employees entitled to a three weeks' vacation, but who were only accorded two

weeks by reason of the delay in obtaining approval of the Wage Stabilization Board if such approval was not forthcoming until late in 1952.

It seems reasonably clear that the parties purposely made the increased vacation benefits retroactive to January 1, 1952, realizing full well that many employees entitled to a three weeks' vacation under the new contract provisions would undoubtedly have to take their allotted two weeks before obtaining the approval of the Wage Stabilization Board. And it was evident that, under such circumstances, it would not be convenient for the employees or for the company to arrange for the additional week's vacation so late in the year. The retroactive feature of the increased vacation benefits agreed upon necessarily contemplated that such situations would arise before the approval of the Board could be obtained. This seems evident when it is noted that the petition was not filed until September 13, 1952. It is entirely reasonable to conclude that most of the vacations in the calendar year of 1952 were taken by defendant's employees before that date.

This employer has obtained the services of these employees for a week when the latter, under their agreement, were to be on vacation for that week with pay, and this is true whether the approval of the Wage Stabilization Board was obtained in 1952 or 1953. No good reason is made apparent why the employer should have a week's extra work from such employees without additional compensation to them. A construction of the contract between the parties which would in effect result in a forfeiture should not be adopted without the clear intent of the parties that such a result should ensue.

Defendant's position is that on December 31, 1952, absent approval of the Wage Stabilization Board, the rights of the employees to increased vacation benefits in 1952 summarily ended without any obligation of the employer to grant any wage payment in lieu thereof. However, my view is that such a construction of the contract is unduly harsh and not consonant with the intent of the parties as reflected in their negotiations and in the contract. And such a construction is not consistent with a fair and equitable accomplishment of the purposes of the contract.

Realistically considered, the situation presented may be summarized as follows: The increased wage benefits reflected in the increased vacations were specifically made retroactive to January 1, 1952, recognizing that in all probability the late filing of the petition on September 13, 1952, would require an adjustment by a weekly wage to the employees who were not accorded the benefit of the extra week's vacation to which they were entitled by agreement of the parties. It is by reason of the failure of the Wage Stabilization Board to act in 1952 that all of the employees entitled to the extra week's vacation were deprived of that benefit through no fault of their own. And there being no restrictions on the parties as to the fulfillment of such contract provisions, they now seek to accomplish the essential purpose of the vacation benefits which were bestowed by having the promisor perform its promise in the only manner in which it can be performed, which is by the payment of a week's wage to each of them. My view is that these parties did not intend that delayed consideration of their petition by the Wage Stabilization Board until after December 31, 1952, would discharge the employer of its contractual duty in this regard. The burden of paying a week's wages to employees deprived of their week's vacation is not substantially greater than the obligation which is required by the literal terms of the contract. It is the Court's view, therefore, that plaintiffs' motion for summary judgment should be granted, and defendant's motion for similar relief should be denied.

An appropriate order consistent herewith may be presented upon ten days' notice. An exception is reserved.